UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

TEVIN JACKSON,

<em>Plaintiff,</em>

-against-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS & COMMUNITY SUPERVISION,
Correction Sergeant JASON M. HOLLAND,
Correction Sergeant J. JARVIS, Correction Officer
MICHAEL M. MORROW, Correction Officer
JOSEPH J. CHAMPAGNE, Correction Officer KYLE
A. MCCARTHY, Correction Officer JONATHAN W.
MCKEE, Correction Officer JON F. YOUNG,
Correction Officer BRIAN A. MILLS, Correction
Officer EVAN J. HOLLAND, Correction Officer
MATTHEW R. EVANS, Correction Officer R.
LAWRENCE, Correction Sergeant TODD J.
STRACK, D. LAROCQUE, RN, G. CLEVELAND,
OMH, C. CHASE, OMH, Correction Officer JOHN
DOES # 1- 5, Medical Staff JOHN/JANE DOES # 6-
10, OMH Staff JOHN/JANE DOES # 11-15,
Correction Officer JOSHUA EMERSON and
Correction Sergeant MATTHEW L. LIBERTY,

<em>Defendants.</em>

-----------------------------------------------------------------X

**COMPLAINT**

Jury Trial Demanded

Case No.:

9:25-cv-245   MAD/MJK

Plaintiff TEVIN JACKSON, by and through his attorneys, Ellie Silverman Law P.C., as

and for their Complaint alleges as follows:

<strong><u>PRELIMINARY STATEMENT</u></strong>

1.      Plaintiff TEVIN JACKSON brings this civil rights action against the Defendants

for the violation of his civil rights, while he was incarcerated at Clinton Correctional Facility

("Clinton").

2.      Defendants brought Mr. Jackson to the first (1st) floor of the infirmary - more well-known as "the Slaughterhouse".  The Slaughterhouse does not have cameras and the medical staff knows to turned a blind eye or otherwise look the other way.  In the Slaughterhouse is where Defendants asphyxiated Mr. Jackson with a plastic bag causing him to lose consciousness.  There, Defendants beat Mr. Jackson all over his body including on the bottom of his feet, causing serious and permanent injuries, including but not limited to a ruptured eardrum and loss of hearing in his right ear.  Mr. Jackson was ridiculed, antagonized, and medicated with antipsychotics against his own wishes.

3.      Plaintiff seeks justice for the Defendants' deliberate violations of his civil and constitutional rights.  This lawsuit demands accountability for the defendants' senseless actions, and damages for the catastrophic injuries they caused.

## JURISDICTION AND VENUE

4.      This action is brought pursuant to 42 U.S.C. § 1983 for violations of rights secured by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

5.      This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

6.      Venue is proper pursuant to 28 U.S.C. § 1391 in the Northern District, which is the judicial district where the events giving rise to this claim took place.

## JURY DEMAND

7.      Plaintiff demands a trial by jury in this action on each of his claims for which a jury trial is legally available.

## THE PARTIES

8.      Plaintiff TEVIN JACKSON is a citizen of the United States and of the State of New York.  At all times relevant to this complaint, he resided in the State of New York.

9.      Defendant STATE OF NEW YORK ("the State") maintains and is responsible for

2

the New York State Department of Correction and Community Supervision ("DOCCS").  Acting through its agency DOCCS, the State is authorized to maintain correctional facilities, and DOCCS acts as its agent and the State is ultimately responsible for DOCCS maintaining and supervising correctional facilities in the State of New York.  The State assumes the risks incidental to the maintenance of correctional facilities and the employment of correctional officers and medical officials under its employ.

10.    DOCCS and the State are responsible for ensuring that people sentenced to a term of imprisonment in a State jail facility receive appropriate care and services required by law. DOCCS and the State oversee and are responsible for maintaining Clinton.

11.    Defendants MICHAEL M. MORROW, JOSEPH J. CHAMPAGNE, KYLE A. MCCARTHY, JONATHAN W. MCKEE, JON F. YOUNG, BRIAN A. MILLS, EVAN J. HOLLAND, MATTHEW R. EVANS, and JOSHUA EMERSON worked at all relevant times as New York State Correction Officers at Clinton.  They are sued here in their individual capacities.

12.    Defendants JASON M. HOLLAND, TODD J. STRACK and J. JARVIS and MATTHEW L. LIBERTY worked at all relevant times as New York State Correction Sergeants at Clinton.  They are sued here in their individual capacities.

13.    Defendant D. LAROCQUE, RN worked at all relevant times as a New York State Correctional Facility Nurse at Clinton.  Defendants G. CLEVELAND and C. CHASE worked at all relevant times as New York State Office of Mental Health (OMH) staff.  They are sued here in their individual capacities and referred to collectively as the "medical providers".  The medical providers were medical and mental health care providers responsible for the medical care of people incarcerated, including Plaintiff.

14.    Defendants MICHAEL M. MORROW, JOSEPH J. CHAMPAGNE, KYLE A. MCCARTHY, JONATHAN W. MCKEE, JON F. YOUNG, BRIAN A. MILLS, EVAN J.

HOLLAND AND MATTHEW R. EVANS, JASON M. HOLLAND, J. JARVIS, TODD J. STRACK, D. LAROCQUE, RN, G CLEVELAND and C. CHASE and DOES Defendants are referred to collectively in this complaint as "the individual Defendants."

15.    At all relevant times Correction Officer JOHN DOES # 1- 5, Medical Staff JOHN/JANE DOES # 6-10 and OMH Staff JOHN/JANE DOES # 11-15 are sued in their individual capacities and are referred to as CO DOES, Medical Providers DOES, respectively.

16.    At all relevant times, the individual Defendants were employed by the State of New York and/or DOCCS and acted under color of law and in the course and scope of their duties and authority as officers, agents, servants, and employees of the State of New York and/or DOCCS.  Accordingly, they are entitled to representation in this action by the New York State Attorney General's Office upon their request.

17.    As officials employed by DOCCS, acting under the color of law in the course and scope of their duties and authority, the individual Defendants were responsible for not violating the incarcerated individuals' rights under 42 USC § 1983.

18.    As officials employed by DOCCS, a public entity bound by both Title II of the ADA, the Rehabilitation Act of 1973 the individual Defendants were responsible for recognizing when incarcerated individuals display signs of medical and mental health emergencies and for taking appropriate measures to ensure that incarcerated individuals in such distress receive immediate medical and mental health attention.

19.    As officials employed by DOCCS, a public entity bound by The Civil Rights Act of 1871, the individual Defendants had a responsibility to not discriminate against Plaintiff based on race.

20.    As officials employed by DOCCS, a public entity bound by the Constitution of the United States, a government may not retaliate against individuals for exercising their rights

under the First Amendment.

21.    Upon information and belief, the individual Defendants are citizens of the United States and citizens and residents of the State of New York.

22.    At all relevant times, the individual Defendants violated clearly established constitutional rights, of which a reasonable person operating in their position would have known and corrected.

## STATEMENT OF FACTS

23.    On February 25, 2022 at approximately 8:00am on C-Block, Plaintiff's cell was opened for a video court hearing.  Upon returning to his cell, Plaintiff noticed that his radio was missing.

24.    At approximately 9:45am, Plaintiff's cell was again opened, this time for a clinic call-out.  On his way to the infirmary, as he walked down the steps, Plaintiff stopped at the first officer's desk where Defendant YOUNG was stationed.

25.    Plaintiff advised Defendant YOUNG that his radio was missing, and explained that if he is no longer permitted to have a radio, he would want it sent home to his family.

26.    Defendant YOUNG told Plaintiff, "get away from my desk and go to your call-out."

27.    Plaintiff responded that he wants to speak to an Area Supervisor (a Sergeant) to tell the Supervisor/Sergeant that if his radio is confiscated, he wants it sent home.

28.    During this entire exchange, Defendant MORROW[1] was standing behind Plaintiff.

29.    After Plaintiff requested to speak to a Sergeant, Defendant MORROW threatened Plaintiff with chemical spray.

---

[1] Defendant Michael M. Morrow was involved in at least three other documented, and nearly identical, assaults on other incarcerated people.

30.    Plaintiff then asked MORROW "you would spray me for asking to speak to the area supervisor?"

31.    Without any verbal response to Plaintiff's question, MORROW indiscriminately and dangerously sprayed Plaintiff in the face and eyes.

32.    Defendant YOUNG was present and in the position to intervene to prevent MORROW from spraying Plaintiff, or at the very least deescalate the situation and Defendant MORROW was present and in the position to intervene to deescalate the back and forth exchange between Plaintiff and YOUNG and both MORROW and YOUNG had the opportunity to prevent this assault on Plaintiff.

33.    Plaintiff, disoriented, temporarily blinded and terrified that he was going to have an asthma attack or go blind (or both), turned towards the immediate area outside of C-Block.

34.    Defendant MORROW chased after him and tackled him to the ground.

35.    While on the ground, restrained and still blinded by the indiscriminate spray of chemical agents, Plaintiff was punched and beaten by Defendant MORROW until "back-up" arrived.

36.    Rather than stopping this attack by MORROW on Plaintiff, Defendants CHAMPAGNE[2] and EVANS joined MORROW.  They continued to punch and otherwise use extreme force on Plaintiff and sprayed more chemical agents in Plaintiff's face and eyes.  At no point was Plaintiff resisting or provoking or posing a threat to Defendants.

37.    Shortly thereafter, Defendant MCCARTHY joined in and restrained Plaintiff by handcuffing him behind his back.

38.    Plaintiff was then escorted to the infirmary.  Plaintiff remained handcuffed behind for the duration of this experience.

---

[2] Defendant Joseph J. Champagne was involved in at least two other documented, and nearly identical, assaults on other incarcerated people.

39.     While being escorted to the infirmary, Plaintiff was still experiencing partial and temporary blindness.  Defendants did not provide Plaintiff with decontamination protocol.

40.     Defendants MORROW, CHAMPAGNE, EVANS and MCCARTHY brought Plaintiff to the first floor of the infirmary, which is commonly known to the incarcerated population as "the Slaughterhouse."

41.     Defendants then escorted Plaintiff into an exam room, where they ordered him to face the wall.[3]

42.     Defendants MCKEE, MILLS, EVAN J. HOLLAND[4], JASON M. HOLLAND[5] and CO DOES entered the exam room coupled with Defendants MORROW, CHAMPAGNE, EVANS, STRACK[6] and MCCARTHY to participate in the commonly accepted and well-known "exam room" beating.

43.     One Defendant then said "you wanted a sergeant, now you got a sergeant." Defendants MCKEE, MILLS, EVAN J. HOLLAND, JASON M. HOLLAND, MORROW, CHAMPAGNE, EVANS, STRACK, MCCARTHY and CO DOES continued beating Plaintiff, punching him repeatedly in the face and back, and kneeing him in the chest, stomach, and legs, while Plaintiff was handcuffed, in pain, bleeding and still unable to see well from the chemical agents in his eyes not being decontaminated.

44.     At one point, an officer–who Plaintiff could not see–beat Plaintiff's feet with a baton, inflicting humiliation and extreme pain due to the high level of nerves in the foot.  The

---

[3] Taking individuals into the exam rooms in order to continue to beat them with impunity is also commonly known among the incarcerated population.

[4] Defendant Evan J. Holland was involved in at least one other documented, and nearly identical, assault on another incarcerated individual.

[5] Defendant Jason M. Holland was involved in at least three other documented, and nearly identical, assaults on other incarcerated people.

[6] Defendant Todd J. Strack was involved in at least one other documented, and nearly identical, assault on another incarcerated individual.

racist undertones of whipping a black man's feet while completely defenseless were not lost on Plaintiff.

45.    There were no medical staff present during the fifteen minutes of this beating…despite being in a *medical* exam room with nine correction officers.

46.    Mr. Jackson noticed some of his vision was returning, because Defendants essentially "beat the chemical agents out of his eyes".

47.    At one point, Defendant JASON M. HOLLAND, a Sergeant, picked up a clear garbage bag and placed it over Plaintiff's head, asphyxiating him while asking him " you still want to speak with a sergeant?"

48.    Plaintiff begged them to stop, but the more he begged, the worse the treatment got, the worse the assault became and the tighter Defendant JASON M. HOLLAND closed the plastic bag around Mr. Jackson's head.

49.    Eventually, Plaintiff lost consciousness due to the suffocation.  When Plaintiff regained consciousness, he "came to" while being slapped by one of the officers and being aggressively told to wake up.

50.    At some point, additional restraints of a chain were clasped around his waist and shackles were placed on his feet.

51.    Defendants flippantly cleaned up Plaintiff's blood and then brought in a nurse, Defendant LAROCQUE, RN[7] to examine him.[8]

52.    At this point, Defendant R. LAWRENCE allegedly began filming Plaintiff under the supervision of Defendant J. JARVIS.  Both were present, as was Defendant. STRACK.

---

[7] Defendant D. Larocque, RN was involved in at least two other documented, and nearly identical, assaults on other incarcerated individuals.

[8] Officers flippantly participating in cleaning up the blood of an incarcerated individual before bringing in the medical staff was also a common occurrence at Clinton.

Defendant R. LAWRENCE reportedly had to change the battery *twice* during the recording, alleging that the battery died twice over the course of approximately 45 minutes.  It is unknown what occurred during the times the battery "died" but based on history, it can be assumed that whatever happened during those "dead battery" intervals was not good.  It is more likely that JARVIS directed LAWRENCE to stop filming certain extended periods of time.

53.    It is unknown which other Defendants are in the room during the medical examination, as all have face coverings and/or their nametags are conveniently not visible on camera.  There are at least three other Correction Officers present ( listed here as CO DOES), in addition to Defendants R. LAWRENCE, J. JARVIS and TODD J. STRACK.

54.    Defendant D. LAROCQUE, RN was in the vicinity of the attack and did nothing to stop it from occurring, deescalate the situation, report it to a different supervisor or call attention to this in any possible manner despite having an extended opportunity to do so.

55.    In the presence of medical and Defendant D. LAROCQUE, RN, Plaintiff asked multiple times for water and reported that he could not breathe over the course of approximately 25 minutes.  It is documented that Plaintiff has asthma.  Defendant D. LAROCQUE, RN ignored his pleas, and one Defendant (face was either covered with a face covering/mask and/or no nametag was visible, or they were off-screen) told him, "if you are talking, you can breathe… and water doesn't help you breathe".

56.    Defendants R. LAWRENCE, J. JARVIS and TODD J. STRACK also ignored his requests for water.

57.    An unknown doctor–potentially Dr. DaMico per Plaintiff's Injury Report, but the handwriting is difficult to make out–brought him a small cup of water after nearly 25 minutes of him reporting he could not breathe and needing water.  When Plaintiff asked for more water and was denied, he pleaded "I just want water, I'm human."

58.     Defendant D. LAROCQUE, RN examined Plaintiff and found him to have a cut to his right ear, a ruptured right ear drum[9], bruises and abrasions to his forehead, edema bruising and abrasions to both eyes, abrasions and bruising to left shoulder and pain in his right ankle.

59.     While Defendant D. LAROCQUE, RN was evaluating Plaintiff, he appeared to be barely conscious and struggled to sit upright.  Another Defendant (face was covered with a face covering/mask and no nametag was visible), told him to stop playing.

60.     The unknown doctor then stitched-up and/or glued the 1.5 inch cut on Plaintiff's right ear.

61.     The battery on Defendant R. LAWRENCE's camera then allegedly died again at the 24:09 mark on the handheld camera recording.  The recording picked back up at 10:46am.  It is unknown how long the camera was off, as there is no time-stamp on the recording–or what occurred

62.     When Defendants forced Plaintiff to his feet to put on his waist chain and then a second time to take photographs of the injuries, he alerted them and repeated that he could not put weight on his right ankle.  Defendants, off-camera, repeatedly yell at him to walk, "stop moving," and "stand up straight."

63.     Defendants at first attempted to force Plaintiff to walk to the x-ray room.  When Plaintiff again expressed his inability to walk, Defendants yelled at him "WALK" and "LET'S GO," like he's a dog.  They eventually said okay, "we'll treat you like a baby" and laid him down on the hospital bed.

64.     Defendants then almost immediately put him in the corner of the room, saying they are going to strip him now.

65.     Defendant D. LAROCQUE, RN asked Plaintiff if he wanted to go to his x-ray or

---

[9] DOCCS' Office of Special Investigations determined this to be a <u>normal</u> injury sustained during a Use of Force incident.

if he was refusing, to which Plaintiff responded that he cannot put weight on his right ankle and cannot walk.  Defendants then finally agreed to get Plaintiff a wheelchair.

66.    When Plaintiff reported to the unknown doctor that his asthma is bad, one Defendant told him to "close [his] mouth."  Plaintiff continued to ask for water and was again ignored, just told to "stand up."

67.    The Defendants–except Defendant JON F. YOUNG and Defendant D. LAROCQUE, RN–circled Plaintiff in the corner of the room, examined his genitals, and removed all his clothes, leaving him naked and in a smock.

68.    The battery on Defendant R. LAWRENCE's camera then allegedly died again at the 36:08 mark on the handheld camera recording.  The recording picks back up at 11:01am.  It is unknown how long the camera was off, as there is no time-stamp on the recording–or what occurred.

69.    Plaintiff was then pushed in a wheelchair to another room in the infirmary, where he tried to undergo an x-ray for his face and right foot, but Defendants continued to antagonize him whenever he asked for water or for decontamination.  They then said "you're out of here" and advised the x-ray technician that he wouldn't be coming back for x-rays.

70.    In fact, in Plaintiff's medical records, the x-ray technician states that he is "too disruptive to get x-rays done, *per security*."

71.    Defendants continued to and repeatedly claimed that he was "playing" whenever he explained that he could not walk on his right foot.

72.    At no point did Defendants decontaminate Plaintiff from the documented use of OC spray or conduct x-rays on his face or foot.  In a video of Plaintiff from March 7, 2022, he is visibly limping and unable to put his full weight on his right leg.

73.    Then, Office of Mental Health ("OMH") provider defendants G. CLEVELAND

authorized two injections of Haldol, which were administered by OMH provider defendant C. CHASE.  Plaintiff verbalized that he does not want the antipsychotic medication but it was invasively injected into him despite his protest.

74.    Defendants then escorted Plaintiff in a wheelchair to the OMH Satellite Unit–the Residential Crisis Treatment Program ("RCTP")–where he was placed under observation in OBS 9 cell, remaining naked and in a smock until approximately March 2, 2022–a total of five days.

75.    While escorting Plaintiff, the Defendant pushing his wheelchair was whistling a happy tune, and went as far as to shout "WOO!" when they arrived at the RCTP.  In response, an officer assigned to the RCTP exclaimed "oh that's a happy woo!"  Plaintiff, all the while, was naked, bleeding, having a hard time hearing and seeing, and drugged in his wheelchair.

76.    Plaintiff was eventually brought to the Special Housing Unit ("SHU") on March 2, 2022, where the harassment continued.

77.    Defendants CO Joshua EMERSON and Sergeant Mattew L. LIBERTY lied and wrote Plaintiff a misbehavior report stating that they discovered a weapon in Plaintiff's personal shoe while they were processing his property for SHU admission on March 7, 2022, which was planted as part of the continued conspiracy to cover up as well as part of the continued retaliation.

78.    Plaintiff then received a 150-day SHU sanction for weapon and contraband in addition to his 120-day SHU sanction for assault on staff. [10]

79.    This ticket was reversed in full on May 24, 2022 for due process violations. Plaintiff was denied the right to review documents used by the hearing officer to determine his guilt, documents which could have proven his innocence.  The damage was already done, Plaintiff suffered the further and wrongful loss of liberty and was already irreversibly harmed.

---

[10] Plaintiff  claims violations pursuant to the HALT law.

80.     This further emphasizes the retaliatory nature of Clinton security staff and their treatment of Plaintiff.

81.     In fact, Plaintiff reported anxiety about "jail staff" just the day before the incident, as documented by RN Nurse Shawn Sherman Bleau #0412 on February 24, 2022 at approximately 6:40pm.  Further, upon information and belief, that same day Plaintiff was issued a tier 2 misbehavior report written by Defendant JON F. YOUNG that was ultimately dismissed due to its unsubstantial and hollow claims.

82.     Plaintiff remained on Clinton's SHU until April 8, 2022, when he was transferred to Upstate Correctional Facility for the remainder of his disciplinary sanction, until August 9, 2022.  This period of incarceration violated the rules against solitary confinement and Plaintiff's right to due process.

83.     In the course of an investigation into the circumstances of this incident, the individual Defendants submitted false statements and manufactured false evidence.

84.     The conduct of the individual Defendants caused Plaintiff to suffer from a ruptured right eardrum and hearing loss in his right ear, scarring to his right ear, difficulty walking due to an undiagnosed and untreated right ankle/knee injury, and chronic neck and back pain.  On March 15, 2022, Plaintiff's wrists still had handcuff markings on them–per Plaintiff's hearing officer, DSS Frenya–given how he was beaten with his hands cuffed behind his back and then remained in said handcuffs for the next hour or so.

85.     Additionally, Plaintiff's entire facial structure/bone was swollen, his eyes were swollen shut, he sustained lacerations on his ear, and he continues to suffer from post-traumatic stress disorder, anxiety, flashbacks and other extreme emotional damages.

86.     Further, an OMH referral for DOCCS medical dated February 25, 2022 indicates that Plaintiff was advising staff on the RCTP as to his asthma diagnosis and difficulty breathing

even later in the day. Yet only on February 28, 2022 did Plaintiff finally undergo "chemical clearance."

87.    The conduct of the individual Defendants caused Plaintiff to suffer from mental anguish.

88.    The conduct of the individual Defendants caused Plaintiff to suffer violations of his constitutional rights.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983 (Excessive Force, Violation of Due Process & Right to Be Free From Punishment)**

89.    Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

90.    Defendants used excessive and unconstitutional force against Mr. Jackson and/or had the opportunity to but failed to intervene to stop the use of excessive and unconstitutional force against Mr. Jackson.

91.    The use of force against Mr. Jackson was done maliciously and sadistically and constituted cruel and unusual punishment.

92.    Here, the conduct is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' "See Velez v. Levy, 401 F.3d 75, 93 (2d Cir. 2005).

93.    In addition to the attacks suffered at the hands of the Correction Officers, CHASE and EMERSON are also liable for excessive force when they forced medication against Plaintiff's will and without his consent.

94.    The Defendants' wrongdoings described above in the Plaintiff's Statement of Facts, which caused Plaintiff to suffer physical injury(ies), amounted to excessive force in violation of the Constitution.

95.    Here, the Defendants satisfy the subjective prong that Defendants acted in bad

faith and that the actions as described above, violated the standards of decency.

96.     Defendants failed to protect Mr. Jackson from the conditions that posed a substantial risk of harm and the Defendants were aware of the risks to Mr. Jackson's health and safety and disregarded these substantial risks of harm.

97.     The use of force against Mr. Jackson was done maliciously and sadistically and constituted cruel and unusual punishment.

98.     The unlawful conduct of Defendants was willful, malicious, oppressive and reckless and was of such a nature that punitive damages should be imposed.

99.     The Defendants' conduct was entirely unjustified and their actions constituted excessive use of force.

100.     Defendants deprived him of his rights under the Eighth Amendment when they threatened him so severely that he was significantly physically and psychologically injured.

101.     The defendants by unjustifiably attacking the Plaintiff and their actions in the aftermath of the attacks violated Plaintiff's right to be free from punishment and deprivation of life and liberty without due process of law and to be free from deliberate indifference to those rights.

102.     The use of force was not in an effort of good faith to restore discipline, but rather was used maliciously and sadistically to hurt Mr. Jackson.

103.     Defendants were aware of the repulsive and dehumanizing conditions within the exam room and rooms he was placed in subsequent to the attacks..

104.     In committing the acts and omissions complained of herein, individual Defendants acted under color of state law to deprive Plaintiff of his constitutionally protected rights under the Eighth, Fourth  and Fourteenth Amendments to the United States Constitution.

105.     As a direct and proximate result of the deprivation of his constitutional rights,

Plaintiff TEVIN JACKSON suffered the injuries and damages set forth above.

106.    The unlawful conduct of individual Defendants was willful, malicious, and oppressive and was of such a nature that punitive damages should be imposed.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 (Deliberate Indifference
a) **Serious Medical Needs–and –**
b) **Safety including Failure to Protect/Unconstitutional Conditions of Confinement)**

107.    Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

108.    As described in the Plaintff's Statement of Facts, there were unreasonable risks to Plaintiff in general and also personal risks.

109.    The Correction Officer Defendants failed to protect Plaintiff from the known and persistent brutality that occurred and they knew that they were placing Plaintiff at a substantial risk of serious harm when they dragged him to the exam room otherwise known as the "Slaughterhouse" and continued to beat and attack him for a protracted amount of time.  This indifference continued far surpassed these attacks and continued for days after.

110.    The Defendants also disregarded Plaintiff's serious and substantially dangerous need for decontamination from the chemical agent.  In addition to having asthma, Plaintiff was suffering extreme pain and the failure to adequately decontaminate Plaintiff lead to serious and permanent injuries.

111.    Here, Mr. Jackson's deprivation of rights throughout this extended experience or sequence of events were sufficiently serious.  Moreover, the deliberate indifference was so sufficiently serious that a reasonable person in the Defendants' position would perceive that treatment was worthy and in many cases throughout this experience, necessary.

112.    In addition to the Defendants directly participating in the deprivations, Plaintiff

also spoke at several different times and told the officers exactly what was wrong or what his issue was at the specific moment.

113.    In committing the acts and omissions complained of herein, the medical provider Defendants acted with deliberate indifference to Mr. Jackson's serious medical needs

114.    In committing the acts and omissions complained of herein, the medical provider Defendants enabling and ignoring Defendants attacks on Mr. Jackson in the infirmary, either with malice or with negligence.

115.    In committing the acts and omissions complained of herein, Defendants D. LAROCQUE, RN, J. JARVIS, JOSEPH J. CHAMPAGNE, MICHAEL M. MORROW, KYLE A. MCCARTHY, JONATHAN W. MCKEE, BRIAN A. MILLS, JASON M. HOLLAND, EVAN J. HOLLAND, TODD J. STRACK, MATTHEW R. EVANS and R. LAWRENCE acted with deliberate indifference to Mr. Jackson's serious medical needs.

116.    In committing the acts and omissions complained of herein, Defendants D. LAROCQUE, RN, J. JARVIS, JOSEPH J. CHAMPAGNE, MICHAEL M. MORROW, KYLE A. MCCARTHY, JONATHAN W. MCKEE, BRIAN A. MILLS, JASON M. HOLLAND, EVAN J. HOLLAND, TODD J. STRACK, MATTHEW R. EVANS and R. LAWRENCE acted with deliberate indifference to Mr. Jackson's serious medical needs when they forced him to walk on his injured right leg and denied him x-rays and treatment due to alleged combative and uncooperative behavior.

117.    In committing the acts and omissions complained of herein, Defendants R. LAWRENCE and J. JARVIS acted with deliberate indifference to Mr. Jackson's safety while filming him in the first floor of the infirmary, knowing the reputation of said area, and while purposefully turning off his camera during abusive moments of Mr. Jackson.

118.    In committing the acts and omissions complained of herein, Defendant JON F.

YOUNG acted with deliberate indifference to Mr. Jackson's safety and health while refusing to intervene, knowing Defendant MICHAEL J. MORROW's propensity for violence and involvement in Clinton's beat up squad.

119.    Defendants continued to exhibit deliberate indifference  to his serious medical needs when they kept him naked in a room for five (5) days.

120.    Moreover, Plaintiff's medical care and medical attention was delayed in the aftermath of these events that compromised this multi-day experience

121.    In committing the acts and omissions complained of herein, Defendants Defendants D. LAROCQUE, RN, J. JARVIS, JOSEPH J. CHAMPAGNE, MICHAEL M. MORROW, KYLE A. MCCARTHY, JONATHAN W. MCKEE, BRIAN A. MILLS, JASON M. HOLLAND, EVAN J. HOLLAND, TODD J. STRACK, MATTHEW R. EVANS and R. LAWRENCE acted with deliberate indifference to Mr. Jackson's safety and health while refusing him water during the course of his medical examination, despite his pleas of difficulty breathing, obvious difficulty sitting up, and documented asthma.

122.    In committing the acts and omissions complained of herein, Defendants Defendants D. LAROCQUE, RN, J. JARVIS, JOSEPH J. CHAMPAGNE, MICHAEL M. MORROW, KYLE A. MCCARTHY, JONATHAN W. MCKEE, BRIAN A. MILLS, JASON M. HOLLAND, EVAN J. HOLLAND, TODD J. STRACK, MATTHEW R. EVANS and R. LAWRENCE acted under color of state law to deprive Plaintiff of his constitutionally protected rights under the Eighth and Fourteenth Amendments to the United States Constitution.

123.    As a direct and proximate result of the deprivation of his constitutional rights, Mr. Jackson suffered the injuries and damages set forth above.

124.    The Defendants exercised deliberate indifference, failure to protect, a disregard for Plaintiff's safety, denial of medical attention, cruelty, extreme recklessness, and intent to

known and probable risks to Plaintiff by failing to take remedial action and allowing a dangerous environment to become so pervasive at Clinton by allowing the abuse, attacks and dangerous conditions to exist.

125.    The individual Defendants were aware of a risk to the life and safety of Plaintiff and failed to act and/or acted improperly, in deliberate indifference to Plaintiff's federally-protected constitutional rights.

126.    Accordingly, Defendants violated the 8th Amendment because they acted with deliberate indifference to the health and well-being of Plaintiff.

127.    Defendants had the power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with deliberate indifference and callous disregard for Plaintiff's rights failed or refused to do so.

128.    Defendants failed to comply with DOCCS policies and/or directives concerning adequate supervision and/or protecting incarcerated individuals from violent assaults.

129.    Defendants also failed to provide adequate medical treatment in a timely fashion and refused to ensure that Plaintiff received the proper treatment.

130.    The unlawful conduct of Defendants D. LAROCQUE, RN, J. JARVIS, JOSEPH J. CHAMPAGNE, MICHAEL M. MORROW, KYLE A. MCCARTHY, JONATHAN W. MCKEE, BRIAN A. MILLS, JASON M. HOLLAND, EVAN J. HOLLAND, TODD J. STRACK, MATTHEW R. EVANS and R. LAWRENCE was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

131.    As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff TEVIN JACKSON suffered the injuries and damages set forth above.

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1985 (Civil Rights Conspiracy to "Cover-Up", Failure to Prevent Conspiracy & Potential Spoliation Therefrom)**

132.    Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

133.    Upon information and belief, the individual Defendants agreed among themselves and with other individuals to act in concert to deprive TEVIN JACKSON of his clearly established rights, including but not limited to his right to be free from cruel and unusual punishment and to receive necessary care for serious medical needs.

134.    In furtherance of the conspiracy, the individual Defendants engaged in and facilitated numerous overt acts, including, without limitation, assaulting Plaintiff, denying him necessary medical care, and upon information and belief, submitting false statements, deleting and or destroying "evidence" and manufacturing false evidence to hide their malfeasance.

135.    The individual Defendants knew that acts previously mentioned, which violated Plaintiff's constitutional rights, were about to be committed, and they had the power to prevent or aid in preventing the commission of the same, but they neglected or refused to do so.

136.    This includes the subsequent falsifications to documents authored by EMERSON and LIBERTY.

137.    As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff TEVIN JACKSON suffered the injuries and damages set forth above.

138.    The individual Defendants are therefore liable for Plaintiff's injuries under 42 U.S.C. § 1986.

139.    The individual Defendants' actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

140.    Defendants R. LAWRENCE and J. JARVIS claim that they reportedly had to change the battery of their handheld camera twice during the recording, alleging that the battery

died twice.  It is unknown what occurred during said blackouts.

141.    The battery on Defendant R. LAWRENCE's camera allegedly dies at the 24:09 mark on the handheld camera recording.  The recording picks back up at 10:46am.  It is unknown how long the camera was off, as there is no time-stamp on the recording–or what occurred.

142.    The battery on Defendant R. LAWRENCE's camera then allegedly dies again at the 36:08 mark on the handheld camera recording.  The recording picks back up at 11:01am.  It is unknown how long the camera was off, as there is no time-stamp on the recording–or what occurred.

143.    Further, Mr. Jackson and his hearing officer DSS Frenya reviewed together the relevant video footage from C-Block on March 15, 2022.  While it was verbalized that the video was glitchy, DSS Frenya also verbalized what they were looking at, including Mr. Jackson's movement to the hallway and the attack on Plaintiff's person.

144.    When Plaintiff requested the video and audio footage from C-Block under the New York Freedom of Information Law, Public Officers Law, Article 6, §§ 84-90 ("FOIL"), they were only provided with audio and a black screen.  Clinton Correctional Facility's Inmate Records Coordinator confirmed on February 19, 2025 that there is no video footage.

145.    Therefore multiple electronic recordings of Mr. Jackson were destroyed, either intentionally or unintentionally, with wanton disregard for Mr. Jackson's due process rights.

146.     As a direct and proximate cause of the negligence described, Plaintiff sustained permanent and severe damages.

**FOURTH CAUSE OF ACTION**
**42 U.S.C. § 1983 (Failure to Intervene)**

147.    Plaintiff realleges and incorporates by reference each allegation set forth in the

foregoing paragraphs as if fully set forth herein.

148.    Defendants were under a duty of safeguarding the public and ensuring the appropriate execution of Defendant's role.

149.    Plaintiff duly relied on Defendants' fulfillment of their duties.

150.    Defendants had an affirmative duty to intercede when Plaintiff's constitutional rights were being violated in Defendants' presence.

151.    At the time of the incidents, Defendants were observing and aware of the wrongful acts against Plaintiff.

152.    At the time of the incident, Defendants neglected to intervene on Plaintiff's behalf in dereliction of their duty to Plaintiff and in deliberate indifference to Plaintiff's well-being.

153.    Defendants violated Plaintiff's constitutional rights when they failed to intercede and prevent the violation or further violation of Plaintiff's constitutional rights and the injuries or further injuries caused as a result of said failure.

154.    Defendants had an affirmative duty to intercede when Plaintiff's constitutional rights were being violated in Defendants' presence by assault, abuse and punishments.

155.    Defendants had reason to know that the Plaintiff was under attack and had exended opportunities to stop or otherwise mitigate it.

156.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered a loss of quality and/or enjoyment of life, physical injury, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983 (1st Amendment Retaliation)**
**Against the Individual Defendants**

157.    Plaintiff realleges and incorporates by reference each allegation set forth in the

foregoing paragraphs as if fully set forth herein.

158.    The defendants, specifically through MORROW and YOUNG retaliated against Plaintiff when he asked to speak to a Sergeant.

159.    Subsequently, all of the individual Correction Officer Defendants retaliated against Plaintiff for previously asking to speak to a Sergeant.

160.    Lastly, JASON M HOLLAND retaliated against Plaintiff for asking for a Sergeant and explicitly connected the punishment to that request and second, retaliated against Plaintiff when he was begging that he could not breathe.

161.    Plaintiff was also denied medical treatment in retaliation for statements Plaintiff made.

162.    Plaintiff was directly threatened and attacked because he asked for a Sergeant and the officers explicitly stated that Plaintiff asking for a Sergeant was the reason for the assaults and the assaults occurred in close proximity and as a legitimate cause and effect of Plaintiff asking to see a Sergeant (Area Supervisor).

163.    Moreover, asking for a Sergeant is comparable in this situation to filing or stating intent to filing a grievance.

164.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered a loss of quality and/or enjoyment of life, physical injury, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff demands the following relief against Defendants, jointly and severally:

(a)    compensatory damages in an amount just and reasonable and in conformity with

the evidence at trial;

(b)     punitive damages to the extent allowable by law;

(c)     attorney's fees;

(d)     the costs and disbursements of this action;

(e)     interest; and

(f)     such other and further relief as this Court deems just and proper.

Dated:     New York, New York
           February 25, 2025

                                                    Yours, etc.

                                                    _____
                                                    Ellie A. Silverman, Esq.
                                                    Ellie Silverman Law P.C.
                                                    *Attorneys for Plaintiff*
                                                    TEVIN JACKSON,
                                                    745 5th Avenue, Suite 500
                                                    New York, New York 10151